## SOLOMON ATTAQUIN & others *vs.* PHINEHAS FISH.

The authority given to the court, by the Rev. Sts. *c.* 81, § 8, and *c.* 105, § 14, to hear and determine in equity all suits and matters concerning waste, where there is not an adequate remedy at law, extends to cases of technical waste only, and not to those trespasses which courts, that have full chancery powers, restrain by injunction.

The authority given to the court, by the Rev. Sts. *c.* 81, § 8, to hear and determine in equity 'all cases in which there are more than two parties having distinct interests, which cannot be justly and definitively decided and adjusted in one action at the common law,' does not apply to a case where one is charged with a trespass upon land, and the question is, whether the land, if he has no title to it, is owned by certain individuals, as tenants in common, or by a municipal corporation.

BILL IN EQUITY. The plaintiffs were the selectmen of the district of Marshpee, and three others, proprietors thereof, who

complained for themselves and the other proprietors. They alleged, in their bill, that they were owners and tenants in common of the lands in said district, which were not held in severalty, and which were known as ' The Commons,' and that they had, through their progenitors, (the Marshpee Indians,) been in possession of said lands from time immemorial — the right to the fee therein never having been held or claimed by any other person : That they were in possession of a part of said lands, known as the parsonage lot, containing about 400 acres, and had not, by any act of theirs, ever parted with the fee or use of said lot : That they were placed under guardianship by the General Court, by *St.* 1788, *c.* 38, and deprived of all exercise of civil or religious liberty, as a community, and that they so remained until, by *St.* 1834, *c.* 166, they were established as a district, and reinstated in their civil rights : That they were also owners of two other parcels of land in Marshpee, one called " Santuet Field, and the other, Great Neck round Daniel's Island."

That by an act passed in the year 1763, [Mass. Temporary Laws, 181,] all the lands belonging to the Indians and Mulattos in Marshpee were made a district, by the name of Marshpee, said act to continue in force three years ; and that " during that period said Indians exercised the rights of self-government, until said act expired by its own limitation, and was never revived : " That afterwards, the proprietors of Marshpee were without any legal government, until the passing of the abovesaid *St.* 1788, *c.* 38 : That in 1783, as appears by the records of the county of Barnstable, Lot Nye of Sandwich, a white man, and Matthias Amos and Moses Pognit, Indians, calling themselves selectmen, signed an instrument, purporting to allot, lay out and sequester forever, a certain tract of wood land, being 400 acres, lying within the plantation of Marshpee, and being Indian property, to lie as a parsonage forever, and to be used and improved for the sole purpose of the support of the gospel in said Marshpee, in all future generations, according to the discipline and worship of the church in that place, which is congregational, and to be forever for the purpose of propagating

the gospel in Marshpee, without any let, hindrance or molesta-
tion : That this instrument was made without any authority in
the parties signing it, who were but two of the tenants in com-
mon with the other proprietors : That said instrument remained
in the possession of Gideon Hawley and Simon Fish, two white
men, until November 10th 1800, when it was recorded : That
no use was made or occupation had of said lot, except as com-
mon land, till June 19th 1809, when the General Court passed a
resolve purporting to confirm and render valid, to all the in-
tents and purposes in said instrument expressed, the grant and
allotment of land therein described, formerly made by the In-
dians, for the support of the gospel ministry among them : That
in 1811, Phinehas Fish, the defendant, was sent to Marshpee,
as a missionary, by the overseers of Harvard College, as trus-
tees of a fund placed in their hands, by the will of John Wil-
liams of London, in 1711, to be dedicated to the " work of
converting the poor Indians " : That said trustees of said fund
agreed with the defendant to pay him $520 per annum, from
said fund, " it having appeared that he was acceptable and useful
as a missionary " : That the proprietors of Marshpee never
assented, in any way, to the settlement of the defendant among
them, nor had any voice in the matter : But that the defendant
took possession of the meetinghouse, which was built (by the
English Society for propagating the Gospel among the Indians)
for the use of Marshpee, and also of the 400 acre lot, known
as " the parsonage," and of said Santuet Field and Great Neck,
and has continued to use the same, to the exclusion of any use
by the proprietors of Marshpee, except their use of said meet-
inghouse for the purpose of holding legal district meetings, as
given to them by the aforesaid St. of 1834, c. 166 — the de-
fendant claiming the use of said Santuet Field and Daniel's
Island, by virtue of St. 1813, c. 44, (which was passed without
the consent of Marshpee,) appropriating those lands as a parson-
age for the use of the missionary on the plantation of Marshpee.

The bill then alleged that after the passing of St. 1834, c.
166, the civil rights of said proprietors were restored, and that
their former guardians had no further control of them or of their

property, and that they had full power and right in equity, if not in law, to exercise the privileges of religious freedom, and the choice of their religious teachers, secured by the constitution of the Commonwealth : That they, after repeatedly forbidding the defendant to use their property, and disclaiming all connexion with him, or assent to his first coming among them, discharged him from all services as a missionary or otherwise, and subsequently settled a missionary of their own choice, whose religious services are attended by forty seven families ; being more than two thirds of the families in said district. Yet that the defendant continued in possession of said parsonage lot, and had committed and continued to commit great strip and waste on said lot by cutting wood on the same, for sale, so that the entire lot would be shortly stripped and wasted, and be of no further value or use until a new growth should spring up — which would require a period of 20 or 30 years.

The bill — after further alleging that the defendant threatened and intended to cut wood, timber and hay from said Santuet Field and Daniel's Island, and to make use of said meeting-house, to the exclusion of the plaintiffs and those whom the plaintiffs represented — concluded with a prayer that the defendant might be restrained, by injunction, from cutting or removing any wood, timber or hay from said lots, or committing or permitting any spoil on or to said premises, or using the same or any part thereof.

The defendant set forth in his *answer*, that the appropriation of the 400 acre lot, in 1783, was made by the selectmen of Marshpee, viz. Lot Nye, Matthias Amos and Moses Pognit, (named in the plaintiffs' bill,) together with Issac Halfday, Joseph Amos and Ebenezer Dives, some of the chief Indians of Marshpee, as he supposed they had a right to do ; and that the same was confirmed by the resolve of the General Court, mentioned in the bill, to " be and remain forever as a parsonage for the use and benefit of a congregational gospel minister " : That the defendant in 1809 was employed, by the corporation of Harvard College, to preach to the Indians at the plantation of Marshpee, reside among them, and perform parochial duties,

which services he performed for about 18 months, and in September 1811 was ordained as a congregational gospel minister and missionary over said Indians, by an ecclesiastical council convened by letters missive from the president and corporation of said college : That the overseers of Marshpee concurred with said corporation in said ordination and settlement of the defendant, and that the majority of said Indians assented thereto, and attended thereat : That he believed he was duly and regularly settled as such minister and missionary and by virtue of a written contract with the overseers of Marshpee, wherein it was stipulated that the defendant should " have and receive the improvement of the woodland already established and appropriated to the use of the ministry, and yearly and every year, during the continuance of his pastoral relation to said plantation," should " take therefrom so much wood as " should " be equal to the annual growth thereof," &c., and that the defendant should " occupy and improve so much meadow and pasture land as " should " be necessary to keep through the year one horse and two cows, during the continuance of his ministry as aforesaid," &c. : That the defendant, after his said ordination, took and has ever since kept possession of said 400 acre lot of woodland, and had, from time to time, taken wood therefrom, pursuant to said contract : That said Santuet Field and Daniel's Island were assigned to the defendant, in pursuance of said contract, for the purpose of keeping a horse and two cows, which assignment was confirmed by the General Court, by *St.* 1813, *c.* 44 ; and that he had, (rightfully, as he believed,) taken and kept possession of said assigned lands, as a parsonage : That the defendant had continued to minister. as missionary at Marshpee, to the time of his said answer, and that he believed his pastoral relation had never been dissolved, but that his rights, as congregational minister and missionary there, still remained : That he believed he had not taken from said 400 acre lot more than the annual growth of the wood thereon, during the time of his possession thereof, and had not committed any strip or waste : That he had used said meetinghouse only for the purpose of religious service, (as he supposed he rightfully might,) in which

**all** the proprietors of Marshpee might have attended, if they had desired so to do : That he had never threatened, and did not intend, to commit any waste on said parsonage lot, nor to use the meetinghouse in any way except for free public worship, at which all the inhabitants of Marshpee may attend.

The defendant annexed to his answer a statement and schedule, as far as he was able, (as he averred,) of the amount and price of the wood and timber taken by him from said parsonage, during the time he had occupied the same.

The plaintiffs filed an *amendment of their bill,* " to meet the case made by the defendant" in his answer, in which they denied that the overseers of Marshpee had any power to make such a contract with the defendant, as is by him set forth, or that they could confer on him any right to use their land, or other property, as a parsonage ; and in support of this their denial, they referred to the acts of the General Court establishing said overseers.

The plaintiffs also denied the authority of said overseers to contract with the defendant for his services as a missionary, or otherwise, beyond the period when the Marshpee Indians were reinstated in their civil rights by the aforesaid *St.* of 1834, *c.* 166.

The plaintiffs further denied the defendant's right to occupy said lands under his alleged contract with said overseers, because that contract purported to have been made only " during the continuance of his " (the defendant's) " pastoral relation," which, if it ever existed under said contract, had been discontinued in law, " by the abolition of said overseers, and the termination of all legal power in them to make or continue a contract binding on the district of Marshpee, or its property, for any future services to be rendered."

The plaintiffs furthermore denied that any parish or religious society of the proprietors of Marshpee existed, in said Marshpee, having power to settle a minister or manage parsonage property, until the passing of *St.* 1840, *c.* 65, which invested said district with all the powers and privileges of other parishes and religious societies, in regard to the public meetinghouse and parsonage lands belonging to said district.

The defendant, in his *answer to the amendment* of the plaintiffs' bill, affirmed that the said overseers had full authority, as he supposed, to make the aforesaid contract with him, and that the rights which thereby vested in him were not impaired by the termination of said overseers' powers by *St.* 1834, *c.* 166 ; that his relation, as minister and missionary, was not affected by said statute ; that said relation had been recognized, impliedly or expressly, by all the legislative acts passed since the defendant's ordination—particularly by *St.* 1813, *c.* 44, referred to in his first answer : That prior to the passing of *St.* 1840, *c.* 65 —although there was no parish or religious society in Marshpee, with power to settle a minister, &c.—the General Court, the Indians of Marshpee, and the overseers of Marshpee, either jointly or severally, had power to settle a congregational minister and missionary over said Indians, and manage parsonage property in said plantation, and that by the acts of the General Court, the consent and desire of said Indians, and the contract and consent of said overseers, (as before set forth,) either jointly or severally, the defendant was legally contracted with, and legally instituted into the office of congregational minister and missionary, and thereby had, and continued to have, a right to use and improve all the parsonage lands of said Marshpee : That by said act of 1840, *c.* 65, it was provided that nothing therein contained should in any way affect or impair the defendant's rights to enjoy the parsonage or other lands improved by him in said district, or any other ministerial rights which he by law had.

*Hallett,* for the plaintiffs.

*Marston & Scudder,* for the defendant.*

WILDE, J.   We have considered this case with great attention, and with a strong inclination to come to such a decision as might determine, if we could, the conflicting claims of the contending parties.   Such a decision, by preventing all further

---

* The following statutes, &c., besides those above referred to, were cited at the argument: Anc. Chart. 14. 32. 33. 132. 133.   Plymouth Colony Laws, 74. 141. 172. 289.   *Sts.* 6 William & Mary, *c.* 1 : 13 William III. *c.* 21 : 4 Geo. I *c.* 11 . 12 Geo. I. *c.* 7.   *Sts.* 1788, *c.* 2 : 1818, *c.* 105 : 1842, *c.* 72.

litigation and expense, would undoubtedly be beneficial to both parties. But upon a full consideration of the case, as stated in the bill, we are of opinion that it is not within the equity jurisdiction of the court.

The bill alleges that the plaintiffs, with others, are the lawful proprietors of the lands described in the bill ; and the charge is, that the defendant has unlawfully committed great strip and waste on the premises, by cutting and carrying away valuable wood, timber and grass, thereon standing and growing ; and that he threatens and intends to continue to commit farther strip and waste in and upon the premises, without any lawful right and title therein or thereto : That although he claims a right of possession of the premises, as a settled missionary or minister of the District of Marshpee, the same being lands set apart as a parsonage ; yet that in truth he has no such right of possession, and that if he ever had been lawfully settled as such missionary or minister, (which the plaintiffs deny,) he nevertheless had been lawfully dismissed by the plaintiffs from his said office and trust, long before the filing of this bill. And the plaintiffs' counsel contends that the case, thus stated, is within the equity jurisdiction of this court concerning waste. Rev. Sts. *c.* 81, § 8

At common law, a prohibition from the court of chancery, which was considered as the foundation of a suit to restrain or punish the commission of waste, lay only against tenant in dower, tenant by the curtesy, and guardian in chivalry ; but it was extended by the statute of Gloucester, 6 Ed. I. *c.* 5, and other statutes, to tenants for life and tenants for a term of years. 22 Vin. Ab. Waste, S. 2 Story on Eq. § 909. Eden on Injunctions, 144. Waste, voluntary and permissive, is defined by Lord Coke to be spoil or destruction in houses, gardens, trees, and other corporeal hereditaments, to the disherison of him that hath the remainder in fee. Co. Lit. 53 *a.* But courts of equity have interposed in many cases where the party is dispunishable at law for committing waste : As where there is a tenant for life, remainder for life, remainder in fee ; the first remainder man for life will be restrained from committing waste, though no action would lie against him, at common law, for the

commission of waste, because the next remainder man had not
the inheritance ; and the remainder man in fee could not main-
tain an action of waste, at common law, because he had not the
immediate remainder. 2 Story on Eq. § 913. And so in
many other cases, courts of equity have interposed to restrain
acts which are deemed equitable waste, from their manifest
injury to the inheritance, although not inconsistent with the legal
rights of the party committing those acts, or threatening to
commit them. 3 Wooddeson, 399–404. 2 Story on Eq.
§§ 914, 915. But the interposition of courts of equity was
always confined to cases founded on privity of title, until Lord
Thurlow, with much hesitation, granted a writ of injunction
against a mere trespasser, who opened a coal mine on his own
close, and took coals from the adjoining close belonging to the
plaintiff—on the ground that irreparable mischief would be the
consequence, if the trespasser were allowed to proceed. And
in *Mitchell* v. *Dors*, 6 Ves. 147, Lord Eldon granted a writ of
injunction against a trespasser, on the authority of the case
before Lord Thurlow. But in *Smith* v. *Collyer*, 8 Ves. 89,
Lord Eldon refused an injunction against cutting timber, where
the title was disputed. He says, " I do not recollect any in-
stance of this sort. The defendant denies that the plaintiffs are
devisees " of the *locus in quo*. " It is not waste but trespass,
upon their own showing. There was no instance of an injunc-
tion in trespass, till the case before Lord Thurlow upon a mine,
which, though trespass, was very near waste. In that case, the
first instance of granting an injunction in trespass, there was no
dispute whatsover about the right. Here the right is disputed."
According to this case, it seems clear that a court of chancery,
having full equity jurisdiction, would not sustain the present bill.
The bill charges a trespass, and the defendant denies the plain-
tiff's title. The main question is one of title, and should be
decided in an action at law ; and nothing is alleged in the bill
which shows that the plaintiffs have not an adequate remedy at
law.

In *Norway* v. *Rowe*, 19 Ves. 146, Lord Eldon says, " the
application, in the case of waste, depends upon privity of title

acknowledged by the answer.   The court has certainly pro-
ceeded to extend injunctions to trespass ; but I do not recol-
lect it ever granted on that head, where the fact of the plaintiff's
title to the property, on which waste was committed, was dis-
puted by the answer."   In *Livingston* v. *Livingston*, 6 Johns.
Ch. 500, 501, Chancellor Kent remarks, that "it is not the
general rule, that an injunction will lie in a naked case of tres-
pass, where there is no privity of title and where there is a legal
remedy for the intrusion.   There must be something particular
in the case, so as to bring the injury under the head of quieting
possession, or to make out a case of irreparable mischief, or
where the value of the inheritance is put in jeopardy."   But
whatever might be the decision of a court having full equity
powers, on this point, we are very clear that this court has no
jurisdiction in equity in the present case.

By the Rev. Sts. *c.* 81, § 8, the court has power to hear
and determine in equity all suits concerning waste and nuisance ;
and by *c.* 105, sundry provisions are made respecting waste and
trespass on real estate, giving remedies by action at law, and in
suits in equity, in sundry cases.   By the first section of *c.* 105,
it is provided that "if any tenant in dower, tenant by the cur-
tesy, or tenant for term of life or years, shall commit or suffer
any waste on the premises, the person, having the next imme-
diate estate of inheritance therein, may have an action of waste
against such tenant, wherein he shall recover the place wasted,
and the amount of the damage done to the premises."   The
2d section provides for a like action in favor of an heir, for
waste done in the time of his ancestor, as well as in his own
time.   By several subsequent sections, tenants in common, co-
parceners and joint tenants are made liable to a penalty for any
strip or waste done to the common property, to be recovered in
an action of trespass.   So if a tenant, during the pendency of
any action for the recovery of lands, shall make any strip or
waste thereon, he is liable to pay threefold damages, to be re-
covered in an action of trespass.   And the like penalty is incurred
by any wilful trespass committed on the land of another person
without license therefor.   Then follows the 14th section, **by**

13 *

which provision is made, "that the supreme judicial court may hear and determine in equity all matters concerning waste, in which there is not a plain, adequate and complete remedy at law."

The question is, whether this section can, by any reasonable construction, be extended to cases of trespass, as well as to those of waste; and we are of opinion that it cannot. The uniform rule of construction of the various statutes conferring chancery jurisdiction on this court has been, never to take cognizance of any subjects which are not expressly brought within it by statute; and not to extend our jurisdiction to such subjects by implication; and certainly not when the implication is doubtful. Now if the legislature had intended to extend the equity jurisdiction of the court to cases of trespass, as well as to those of waste, it would have been so expressed. The learned commissioners, who framed the revised statutes, must, we think, have had in mind the technical distinction between waste and trespass, and the inference is, that the 14th section was not intended to embrace cases of trespass. But if no such inference could be made, we think it very clear that this section cannot be extended so as to include any trespass not mentioned in the statute; and this is not such a trespass. The 11th section provides, that "if upon the trial of such an action," (trespass) "it shall appear that the defendant had good reason to believe that the land on which the trespass was committed was his own, or that he was otherwise lawfully authorized to do the acts complained of, he shall be liable only for the single damages assessed therefor." Now supposing that the trespass complained of in this suit may be proved to be such a trespass, still we have no jurisdiction in equity; for the provision refers clearly to a trial in an action at law wherein the plaintiff demands threefold damages; and that is an adequate and an appropriate remedy.

Another ground on which the plaintiffs rely is, that here are or may be "more than two parties, having distinct rights or interests, which cannot be justly and definitively decided and adjusted in one action at the common law." Rev. Sts. *c.* 81, § 5.

But this clearly is not such a case. If the plaintiffs are proprietors of the *locus*, they alone are entitled to damages ; or if the *locus* is the property of the district of Marshpee, then the district alone is entitled to sue ; so that in either case the remedy at law is the proper remedy.

*Bill dismissed*